IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD HARRISON BURNETT | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SPRINGFIELD TOWNSHIP, *et al*. | : | No. 13-1646 |
| Defendants. | : | |

## MEMORANDUM

**L. Felipe Restrepo, J.**                                              **July 8, 2014**

Ronald Harrison Burnett brings this discrimination suit against Springfield Township, Springfield Township's town manager, Montgomery County, and various members of the Springfield Township and Montgomery County police departments pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986; the Fifth and Fourteenth Amendments to the United States Constitution; and Pennsylvania tort law.  Burnett alleges that the defendants denied him law enforcement protection and redress because of his race and gender.  He further alleges intentional infliction of emotional distress by all defendants.

The defendants have moved to dismiss Burnett's First Amended Complaint.  For the reasons that follow, I will grant the motion, although I will also grant Burnett leave to amend.

### I.   FACTS ALLEGED

Taking Burnett's factual allegations as true for purposes of this motion, the relevant events are as follows.

Burnett is of Native American descent, and he resides in Springfield Township, Montgomery County.  First Am. Compl. (hereinafter "Compl."), ECF Doc. 2,  ¶¶ 6-7, 16, 26, 30. Very few Native Americans live in Montgomery County.  *Id*. ¶ 26.  During their interactions with Burnett, some defendants have referred to him as black or African-American.  *Id*. ¶ 29.

On March 13, 2011, Burnett requested assistance from the Springfield Township police department to remove his "hostile and belligerent Caucasian ex-girlfriend" from his residence. *Id*. ¶ 30.  Eight days later, he contacted the Township police again to report that his ex-girlfriend was "skulking around the neighborhood" and possibly stalking him.  *Id*. ¶ 32.  The Township police took no action in response to that call.  *Id*. ¶ 33.

On March 28, 2011, Burnett's ex-girlfriend and two other Caucasians allegedly broke into Burnett's home, causing him financial loss in excess of $16,000.  *Id*. ¶¶ 37, 55.  Several of Burnett's neighbors witnessed the incident.  *Id*. ¶ 37.  On discovering that his home had been burglarized, Burnett immediately contacted the Springfield Township police.  *Id*. ¶ 40.  Detective Robert Chiarlanza (identified in the Complaint as "Sean Lanza") was dispatched to the scene, where he investigated, dusted doors for fingerprints, and told Burnett that he would be in touch within a few days.  *Id*. ¶¶ 41-42.  On further investigation, Chiarlanza allegedly discovered that one of the perpetrators had admitted to breaking into the home with two other people.  *Id*. ¶ 45.  He made no arrests, however.  *Id*. ¶ 49.  When Burnett called him on April 7, 2011 to ask why, Chiarlanza informed Burnett that he viewed the matter as a civil dispute, and that Burnett could file a civil complaint or a private criminal complaint against the perpetrators.  *Id*. ¶ 50.

Burnett "was referred to" Montgomery County Detective Richard Peffall (identified in the Complaint as "Rich Peffle").  *Id.* ¶ 56.  Peffall, in turn, informed Burnett that Montgomery County would not prosecute his ex-girlfriend because there were "over 10 domestic complaints" already on file in the county between Burnett and his ex-girlfriend – which, according to Burnett, was not true.  *Id*. ¶ 57.  In June of 2011, Burnett submitted "a lengthy written" document to Springfield Township Chief of Police Randall Hummel, clarifying that he was not a "'black male' with a long history of domestic issues with a 'live-in' Caucasian 'girl friend,'" and asking

Hummel to investigate the "crimes of violence perpetrated against" him.  *Id*. ¶¶ 61-65.  Hummel took no action.  *Id*. ¶ 63.  In July of 2011, Burnett filed a private criminal complaint with Detective Fred Bailey of Montgomery County, but Bailey "refused to process the complaint." *Id*. ¶¶ 65-66.  Bailey is African-American.  *Id*. ¶ 14.

Throughout this course of events Burnett made "numerous pleas" to Donald Berger, the town manager of Springfield Township, for a more rigorous investigation of the burglary.  *Id.* ¶ 69.  Burnett alleges that Berger "always responded in a racially hostile and deliberately indifferent manner."  *Id*. ¶ 69.  The only specific example the Complaint offers, however, is that, in an August 12, 2011 email, Berger responded, "I did not find fault with the actions taken by the police, but do appreciate the overall difficult situation."  *Id*. ¶ 71.

In August and September of 2011, Burnett asked two other Montgomery County detectives, Detective Richard Marsh and Detective Stanley G. Kadelski, Jr., to investigate the burglary.  *Id*. ¶¶ 73-76.  Both declined.  *Id.*  Burnett then wrote to Montgomery County Deputy District Attorney Chris Maloney, asking why his office had refused to process Burnett's private criminal complaint, but received no response.  *Id*. ¶ 82-83.

On September 11, 2011, Burnett attempted to file a private criminal complaint with "Montgomery County Magisterial Office 38-1-08."  *Id.* ¶85.  He was rebuffed and directed to a department in the Court of Common Pleas, despite the fact that on an earlier occasion (in July of 2010) the Magisterial Office had prosecuted Burnett himself for disorderly conduct.  *Id*. ¶¶ 85-86.  This prior prosecution was initiated after Burnett called the Springfield Township police to his residence to remove his "violent and belligerent Caucasian ex-girlfriend," and was instead arrested himself.  *Id*. ¶¶ 85-86.

Burnett filed this federal lawsuit in March of 2013.  His First Amended Complaint contains five counts:  (1) race and gender discrimination in violation of the Equal Protection Clause, pursuant to 42 U.S.C. § 1983 (against all defendants); (2) conspiracy to violate equal protection, pursuant to 42 U.S.C. §§ 1981, 1983 and 1985(3) (against all defendants);[1] (3) failure to train and supervise in violation of the Equal Protection Clause, pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (against the municipal defendants); (4) failure to intervene to prevent deprivations of equal protection, pursuant to 42 U.S.C. §§ 1986, 1985(3) and 1983 (against Berger, Hummel and Kadelski); and (5) intentional infliction of emotional distress (against all defendants).

The defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that Burnett has failed to state a claim upon which relief can be granted.  Additionally, as clarified at oral argument and by supplemental briefing, the defendants move to dismiss for lack of subject-matter jurisdiction on the basis that Burnett has no standing to assert a constitutional claim.  *See* Fed. R. Civ. P. 12(b)(1); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992) (explaining that standing is jurisdictional).

## II.   JURISDICTION

As a general matter, this Court has subject-matter jurisdiction over Burnett's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Burnett's state-law claim pursuant to 28 U.S.C. § 1367.  The intentional infliction of emotional distress count is closely related to the other four counts, such that it forms "part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

There is no Article III case or controversy, however, unless Burnett has alleged facts sufficient to show that he has standing to challenge the actions at issue.  "[T]he irreducible

---

[1] To the extent that this count alleges a simple equal protection claim, it is duplicative of Count I.

constitutional minimum of standing contains three elements," *Lujan*, 504 U.S. at 560:  (1) The

plaintiff must have suffered an "injury in fact" that (2) is "fairly traceable to the challenged

action of the defendant, and not the result of the independent action of some third party," and (3)

is capable of being redressed by the court.  *Id.* at 560-61 (internal alterations and quotation marks

omitted).  An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete

and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560

(internal quotation marks and citations omitted).

According to the defendants, Burnett's primary complaint is that they did not adequately

investigate and prosecute his ex-girlfriend for the alleged burglary of his home – an omission

that is not, itself, a legally cognizable injury to Burnett.  As the Supreme Court held in *Linda R.S.*

*v. Richard D.*, 410 U.S. 614 (1973), "a citizen lacks standing to contest the policies of the

prosecuting authority when he himself is neither prosecuted nor threatened with prosecution,"

because no citizen has "a judicially cognizable interest in the prosecution or nonprosecution of

another."  *Id.* at 619.  Burnett contends that he had at least a right to the investigation of the

crime, but he has provided no authority establishing that right, and I have identified none.  *Cf.*

*Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law

right, much less a constitutional right, to an investigation.").  Finally, Burnett styles the

defendants' inaction as a denial of his First Amendment right of access to courts, but has alleged

no fact suggesting that he was excluded from an official proceeding to which the right of access

applies.  *See, e.g., Delaware Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 513-14 (3d Cir.

2013) (surveying case law on the First Amendment right of access).  The burglary itself,

meanwhile, is clearly an "injury in fact" – but is not "fairly traceable" to the defendants' actions,

and is the "result of the independent action of some third party not before the court."  *Id.* at 561.

In truth, however, the injury that Burnett alleges is not merely what he regards as ineffective law enforcement; it is the defendants' (alleged) discrimination against him on the basis of his race and gender.  Burnett may have no legally protected interest in police responsiveness, but equal protection does entitle him to receive whatever services the police provide on the same terms as his neighbors, without distinctions based on gender or skin color. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.") (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)); *Mody v. City of Hoboken*, 959 F.2d 461, 466 (3d Cir. 1992) (assuming "that discriminatory denial of police protection on the basis of race constitutes a violation of section 1983"); *see also, e.g.*, *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) ("[S]elective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection."); *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000) ("There is a constitutional right . . . to have police services administered in a nondiscriminatory manner."); *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988) ("There is no general constitutional right to police protection, but if the state provides police protection it is prohibited from irrational discrimination in providing such protection.").

The injury that anchors discriminatory failure-to-protect claims is the alleged discrimination itself.  The Third Circuit does not appear to have said so explicitly, but it has implicitly held as much by recognizing and allowing such claims.  *See Mody*, 959 F.2d at 466; *Hynson v. City of Chester*, 864 F.2d 1026, 1031 (3d Cir. 1988); *Brown v. Grabowski*, 922 F.2d 1097, 1101 (3d Cir. 1990); *Burella v. City of Philadelphia*, 501 F.3d 134 (3d Cir. 2007).  Given

6

that the crimes perpetrated against the plaintiffs in those cases were not caused by the police, they cannot have been the source of standing.  The relevant injury must have been, instead, the alleged unequal treatment that rendered police protection less available to disfavored class members than to others.  The same is true of discriminatory failure-to-protect cases in other circuits in which standing has been assumed.  *See, e.g.*, *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011); *Hilton*, 209 F.3d at 1007-08; *see also Estate of Macias*, 219 F.3d at 1028 (holding that the injury in discriminatory-failure-to-protect case was not Mrs. Macias' murder, but rather "the alleged denial of equal police protection" to her).

This is consonant with equal protection case law in other realms, which has regularly asserted that the "injury in fact" in equal protection cases may be "the denial of equal treatment" that results in a diminished chance of obtaining a government benefit.  *See, e.g.*, *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment . . . , not the ultimate inability to obtain the benefit."); *Gratz v. Bollinger*, 539 U.S. 244, 261-68 (2003) (holding that denial of "opportunity to compete for [college] admission on an equal basis" conferred standing); *United States v. Lopez*, 650 F.3d 952, 960 n.7 (3d Cir. 2011) (denial of access to "fast-track" sentencing program conferred standing); *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008) ("The injury in fact is the denial of equal treatment.").  As the Supreme Court has explained, an allegation of discriminatory treatment confers standing because discrimination "can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group," and can be redressed by a mandate of equal treatment.  *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984).  *Cf. Estate of Macias*, 219 F.3d at 1028 (noting that a plaintiff

"may prove a violation of § 1983 without demonstrating that the deprivation of his or her constitutional rights caused any actual harm.").

While equal protection includes the right to non-discriminatory police protection, there is some question as to whether individuals also have a right to the non-discriminatory investigation or prosecution of crimes against them.  The Eighth Circuit has held that they do not.  *See Parkhurst v. Tabor*, 569 F.3d 861, 866 (8th Cir. 2009) (holding that plaintiffs had no standing to contest an allegedly discriminatory failure to prosecute).  The Ninth Circuit has held that they do. *See Elliot-Park v. Manglona*, 592 F.3d 1003, 1007 (9th Cir. 2010) (holding that plaintiff could contest an allegedly discriminatory failure to investigate and prosecute because "[t]he government may not racially discriminate in the administration of *any* of its services").  The Third Circuit has not addressed the issue.  The Ninth Circuit's reasoning, however, is persuasive – both on doctrinal grounds and for the practical reason that there is no clear line between "protective" and "investigative" police services.  *See Elliot-Park*, 592 F.3d at 1007 ("If police refuse to investigate or arrest people who commit crimes against a particular ethnic group, it's safe to assume that crimes against that group will rise.").  Pursuant to that reasoning, Burnett does have standing to challenge the defendants' allegedly discriminatory response to both his initial report that his ex-girlfriend was potentially stalking him and to the burglary of his home.

## III.    RULE 12(B)(6) STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the

speculative level." *Id.* "In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

To determine the sufficiency of a complaint, a court must (1) note the elements required to plead a claim, (2) identify any allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth," and (3) determine whether the remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting and citing *Iqbal*, 556 U.S. at 679-80).

IV.   **DISCUSSION**

    **A.  Count I: 42 U.S.C. § 1983 (Equal Protection)**

Burnett's central claim is Count I, which seeks relief pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment for denial of equal protection.  Burnett alleges that the defendants failed to prevent, investigate and redress the burglary of his home because of his race and gender.

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  Section 1983 empowers private citizens to bring equal protection claims against state and municipal actors. *See* 42 U.S.C. § 1983; *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).  "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination."  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing *Batson v. Kentucky*, 476 U.S. 79, 93 (1986)).  In other words, the plaintiff must demonstrate that s/he was treated differently than other similarly situated persons and that the

disparate treatment was based on the plaintiff's protected class status.  *See, e.g.*, *Andrews*, 895

F.2d at 1478; *Pitts v. Delaware*, 646 F.3d 151, 157 (3d Cir. 2011).[2]

The next step in the Rule 12(b)(6) analysis is to identify any allegations in the complaint

that constitute "mere conclusory statements" or "naked assertions" and so are not entitled to the

assumption of truth.  *Iqbal*, 556 U.S. at 678-81; *Santiago*, 629 F.3d at 130.  In this case there are

many.

      *i.*    *Conclusory Allegations*

At least seven paragraphs in Burnett's Complaint accuse individual defendants of race

discrimination in identical, conclusory terms.  According to the Complaint, Defendants Lanza,

Peffle, Hummell, Bailey, Berger, Marsh and Kadelski each "simply turned a blind eye to [the

burglary] because the perpetrators were Caucasians and Mr. Burnett was a minority whom he

thought was a 'Black male.'"  Compl. ¶¶ 53, 60, 64, 68, 72, 75, 81.  Allegations about other

people's mental states are conclusory unless they are linked to facts from which the relevant

mental state might be inferred.  *See, e.g.*, *Twombly*, 550 U.S. at 554-55 (holding that mere

allegation of agreement in conspiracy claim is conclusory; more specific factual allegations that

"plausibly suggest[]" agreement are required); *Iqbal*, 556 U.S. at 680-83 (finding allegations of

intentional discrimination conclusory where complaint did not "contain any factual allegation

sufficient to plausibly suggest petitioners' discriminatory state of mind"); *Great W. Mining &*

---

[2] In failure-to-protect cases that allege discrimination against victims of domestic violence on the basis of
gender, the Third Circuit has held that (in the absence of direct evidence of discriminatory animus) a
plaintiff must show that

      (1) the policy or custom of the police is to provide less protection to victims of domestic
      violence than to other victims of violence; (2) discrimination against women is a
      motivating factor; and (3) the plaintiff has been injured by this custom.

*Brown v. Grabowski*, 922 F.2d 1097, 1101 (3d Cir. 1990) (citing *Hynson*, 864 F.2d at 1031); *see also*
*Burella*, 501 F.3d at 148.

*Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) ("[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred."). Likewise, Burnett's allegations that the defendants "intentionally, recklessly, maliciously and unlawfully suppressed [] evidence in order to deny Mr. Burnett equal protection of the law" is a conclusory allegation, as to both the defendants' mental state and the legal characterization of their actions. Compl. ¶ 43.

Secondly, Burnett's Complaint contains a bevy of unsupported generalizations. He alleges, for instance, that the defendants denied him resources that they "routinely afford Caucasian females whose residences have been burglarized by minority men who are [their ex-boyfriends]," *id.*; that the defendants "zealously and blindly prosecute minority men who admit to burglarizing residential properties owned by Caucasian female[s]," *id.* ¶ 46; that Kadelski "routinely responds to complaints made by Caucasian women who make allegations that men of color have perpetrated violent crimes against them," *id.* ¶ 77; that "[i]t is an undisputed fact that the Montgomery County District Attorney's Office responds to complaints made by Caucasian females about domestic violence," *id.* ¶84; and that the defendants provide Caucasian females "with preferential treatment in the investigation and prosecution of violent crimes," *id.* ¶ 91. These abstract allegations would ultimately require some form of cumulative evidence to prove. Plaintiffs need not provide it at the pleading stage, but nor can a plaintiff simply assert the existence of a broad pattern without some reference to underlying facts that support it. Burnett's Complaint does not indicate any factual basis for these categorical statements. They are, in the context of this Complaint, "bald allegations." *Iqbal*, 556 U.S. at 681.

Finally, Burnett's Complaint hypothesizes that if a "Caucasian female had complained about [a] minority male 'skulking around the neighborhood' and possibly stalking a white

11

woman," the defendants would have responded aggressively.  Compl. at ¶ 36.  A hypothetical, regardless of its accuracy, is not a fact sufficient to support a legal claim.

In fairness to Burnett, the difference between a "well-pleaded" fact and a "bald allegation" is not always clear.[3]  In this Court's view, well-pleaded facts suggest an adequate basis for knowledge, while "conclusory" or "bald" allegations lack an apparent basis for knowledge.  In general, allegations describing directly perceptible events (things a person can perceive via her five senses) are well pleaded.  Courts refer to these as "specific" facts, "concrete" facts, "factual matter" or simply "facts"; they concern "real-word events" or things that "actually happened."  *See, e.g.*, *Twombly*, 550 U.S. at 556, 563; *Iqbal*, 556 U.S. at 677-78; *Great W. Mining & Mineral Co.*, 615 F.3d at 179-81; Steinman, 62 STAN. L. REV. at 1298.  By their nature, such allegations suggest that the events described were directly experienced by the plaintiff, or by someone to whom the plaintiff has access.  In contrast, an assertion of a fact that a person cannot perceive directly (like another person's intention, which we infer from sensory data; a pattern, which we infer from cumulative data; or a quality, like "negligent" or "discriminatory," that involves an analytical judgment about the meaning of sensory data) will generally be "conclusory" unless the complaint indicates an adequate basis for the inference.[4]

---

[3] *See, e.g.*, Adam N. Steinman, *The Pleading Problem*, 62 STAN. L. REV. 1293, 1295 (2010) (diagnosing a "crisis" in federal pleading standards); Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*: A Double Play on the Federal Rules of Civil Procedure*, 60 DUKE L.J. 1, 24 (2010) ("[T]he emerging case law is revealing that, like the Emperor in the well-known fable, the fact-conclusion dichotomy has no clothes.").

[4] For recent academic treatments of this topic, *see, e.g.*, Stephen R. Brown, *Reconstructing Pleading:* Twombly*,* Iqbal*, and the Limited Role of the Plausibility Inquiry*, 43 AKRON L. REV. 1265, 1288 (2010) ("An allegation in a complaint is conclusory when the allegation attempts to plead directly an element of a claim that is only indirectly sensory-perceptible."); Steinman, 62 STAN. L. REV. at 1298 (advocating "transactional approach" to pleading that would require plaintiffs to "provide an adequate transactional narrative, that is, an identification of the real-world acts or events underlying the plaintiff's claim"); A. Benjamin Spencer, *Understanding Pleading Doctrine*, 108 MICH. L. REV. 1, 14 (2009) (suggesting that a non-conclusory allegation is one "of observed or experienced objective facts about what transpired"); Luke Meier, *Why* Twombly *is Good Law (but Poorly Drafted) and* Iqbal *Will Be Overturned*, 87 IND. L.J. 709, 711-12 (2012) (interpreting pleading rules to demand that plaintiffs "describe the real-world events

There are, of course, "area[s] of law in which plaintiffs face information asymmetries such that even viable claims will be lacking in critical information before discovery," *Food Sciences Corp. v. Nagler*, 2010 WL 4226531, at *3 (D.N.J. Oct. 20, 2010), and Burnett argues that this is one. Even in those areas, however, plaintiffs must allege sufficient non-conclusory factual matter to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. Burnett's Complaint does not.

ii.   *Well-Pleaded Facts*

Setting aside its conclusory allegations, the factual matter that remains is insufficient to make out the elements of Burnett's equal protection claim. As chronicled above, Burnett alleges, in some detail, that he and his Caucasian ex-girlfriend have had a stormy relationship; that he has summoned the police at least twice to have her removed from his property; and that on one of those occasions he was instead arrested and prosecuted himself. He further alleges that when he reported her "skulking around the neighborhood" the police were unresponsive, that she subsequently burglarized his home with two accomplices, and that, despite ample evidence of her crime, the various defendants not only neglected to prosecute her but also rebuffed Burnett's many efforts to seek redress. All of that factual matter is adequately pled. Assuming it to be true, however, it does not state a discrimination claim.

---

on which the suit is based with some degree of factual specificity"); Kevin M. Clermont & Stephen C. Yeazell, *Inventing Tests, Destabilizing Systems*, 95 IOWA L. REV. 821, 841 (2010) (suggesting that courts "look mainly at what the plaintiff appears to be alleging actually happened (and then ask whether the elements of liability are a plausible inference from those allegations taken as true)"); Donald J. Kochan, *While Effusive, "Conclusory" Is Still Quite Elusive: The Story of A Word,* Iqbal, *and A Perplexing Lexical Inquiry of Supreme Importance*, 73 U. PITT. L. REV. 215, 254 (2011) (surveying dictionary definitions of "conclusory" and suggested definitions by scholars in the context of *Twombly* and *Iqbal*). *But see* Walter Wheeler Cook, *'Facts' and 'Statements of Fact'*, 4 U. CHI. L. REV. 233 (1936) (pointing out that "facts" and "conclusions" are not logically severable categories, because every "fact" involves some interpretation); Miller, 60 DUKE L.J. at 20 (arguing that *Twombly* and *Iqbal* have resurrected "fact pleading by another name").

The alleged facts do not show, first of all, that the defendants treated Burnett differently than any similarly situated person.  Burnett argues that he has "plausibly pleaded that he was treated differently than a similarly situated Caucasian female crime victim," citing a string of allegations from the Complaint.  Pl.'s Supp. Br. (Doc. 36) at 7.  For the reasons discussed, nearly all are conclusory.  Only three facts alleged in the Complaint are potentially relevant to this point and not conclusory:  the allegations that (1) "[a]pproximately two years before [the burglary], a group of young African-American men from Philadelphia County were arrested and prosecuted for burglary and other offenses by law enforcement officials in Springfield Township and Montgomery County," Compl. ¶ 47; (2) "[p]risons throughout [Pennsylvania] have minority men who were prosecuted for burglarizing residential properties owned by Caucasian residents of Springfield Township and Montgomery County," *id.* ¶ 47-48; and (3) the municipal defendants prosecuted Burnett, but not his ex-girlfriend, after a prior incident at his home, *see id.* ¶¶ 86-87.  The last of these suggests that the municipal defendants treated Burnett differently than his Caucasian ex-girlfriend at a specific point in the past.  But none of these facts suggests that any defendant did – or would – provide superior treatment to a Caucasian woman who called the police to report a hostile ex in the neighborhood or whose house was burglarized in circumstances similar to Burnett's.[5]

Finally, even if Burnett's Complaint were deemed sufficient to suggest differential treatment, it lacks any factual basis for an inference that he was treated differently because of his race or gender.  Aside from his conclusory allegations of racial animus, which do not warrant the assumption of truth, the only allegation relevant to discriminatory intent is that the individual

---

[5] Perhaps Burnett means to contrast the police protection afforded his ex in 2010 with the defendants' alleged failure to protect him in 2011.  The contrast supports Burnett's claim but does not, on its own, establish the claim, because it is not apparent that Burnett (in 2011) and his ex (in 2010) were "similarly situated."

defendants "repeatedly" referred to Burnett as "Black or African-American" despite his Native American ethnicity.  Compl. ¶ 29.  The defendants' apparent belief that Burnett was African-American does not suggest that their actions or inactions were racially motivated.

In sum, Burnett has not described acts and events that support an inference of intentional discrimination.  Facts showing that a woman or Caucasian person received better treatment (in similar circumstances) might support such an inference – but Burnett has pled no facts showing that any person who sought similar services from the defendants, under similar circumstances, received better treatment than he did.  Facts demonstrating a pattern of apathy by the defendants to crimes against African-American men might suggest discrimination, but Burnett has pled no actual facts indicating such a pattern.  Finally, when police inaction is particularly egregious and has no legitimate justification, the inaction itself might suggest discrimination.  *Cf. Burella*, 501 F.3d 134, 136 (gender discrimination claim reached summary judgment where police failed to arrest husband after "numerous incidents of abuse" and continued threats against his wife); *Elliot-Park*, 592 F.3d at 1006-08 (denying motion to dismiss race discrimination claim arising in Northern Mariana Islands where Micronesian police failed to breathalyze or arrest the visibly intoxicated Micronesian man who crashed into Korean plaintiff's car).  Even construing the Complaint as favorably to Burnett as possible, though, the defendants' alleged failures are not so egregious as to suggest discriminatory animus; some of their alleged interactions with him suggest, on the contrary, considerable patience.

Burnett argues that he should have the chance to seek data from the defendants through discovery in order to demonstrate the broad race and gender disparities in the provision of police services that he alleges.  *Cf. Wright v. City of Philadelphia*, No. 01-6160, 2005 WL 3091883, at *13-16 (E.D. Pa. Nov. 17, 2005) (finding that plaintiff had provided adequate evidence of

gender-based police discrimination to survive summary judgment where plaintiff offered records of City Council hearings and its report on the issue as well as the results of internal investigations).  In the absence of any fact suggesting race or gender discrimination, however, the possibility that systemic disparities might exist is not an adequate ground for sustaining an equal protection claim.

Because the facts alleged, if proven, would not support either a finding of disparate treatment or of discriminatory motive, Burnett has not pled facts that "plausibly give rise to an entitlement for relief," and Count I of his Complaint will be dismissed.  *Santiago*, 629 F.3d at 130 (3d Cir. 2010) (quoting and citing *Iqbal*, 556 U.S. at 679-80); *cf. Burella*, 501 F.3d at 148 (noting that, to survive summary judgment on equal protection failure-to-protect claim, plaintiff must provide evidence sufficient to support a finding of discriminatory intent) (citing *Hynson*, 864 F.2d at 1031).

### B.  Count II: 42 U.S.C. §§ 1985(3), 1983, 1981 (Conspiracy)

The precise nature of Burnett's claim in Count II is somewhat unclear, but he appears to allege a direct conspiracy pursuant to 42 U.S.C. § 1985(3), and, pursuant to § 1983, that defendants conspired to deprive him of the equal protection guaranteed by 42 U.S.C. §§ 1981 & 1985(3) and by the Fourteenth Amendment.[6]

The elements of the two claims are essentially the same.  "In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right" (in this case, equal protection). *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999).  The plaintiff

---

[6] This Count is titled "Denial of Equal Protection of Laws" in the Complaint.  Because it is wholly duplicative of Count I to the extent that it asserts direct violations of equal protection, I will construe it as a conspiracy claim, as suggested by the allegation that "Defendants, acting under the color of state law and in active concert with each other, have failed to provide Plaintiff with the same protections that they afforded a non-resident Caucasian female and other Caucasians."  Compl. ¶ 100.

must also show that he was "injured" by a constitutional deprivation.  42 U.S.C. § 1983.  To

prevail on a § 1985(3) conspiracy claim, a plaintiff must prove (1) that the defendants conspired;

(2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of

the equal protection of the laws;" (3) that one or more of the conspirators committed an act in

furtherance of the conspiracy; and (4) that the plaintiff was "'injured in his person or property' or

'deprived of having and exercising any right or privilege of a citizen of the United States.'"

*Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971) (quoting 42 U.S.C. § 1985(3)).  To state any

conspiracy claim, a plaintiff must allege "facts that plausibly suggest a meeting of the minds."

*Great W. Mining & Mineral Co.,* 615 F.3d at 179; *see also Startzell v. City of Philadelphia,*

*Pennsylvania*, 533 F.3d 183, 205 (3d Cir. 2008).  A "conclusory allegation of agreement at some

unidentified point" is not adequate.  *Twombly,* 550 U.S. at 557.

The categorization of the allegations in Burnett's Complaint as conclusory or well-

pleaded for purposes of Count I applies to this count as well, with the same result.  Because

Burnett has neither stated a claim for an underlying constitutional deprivation nor pled facts that

plausibly suggest an agreement to deprive him of equal protection, he has failed to state a

conspiracy claim pursuant to either § 1985(3) or § 1983, and Count II will be dismissed.

### C.  Count III: 42 U.S.C. § 1983 and *Monell* (Failure to Train / Supervise – Municipal Defendants)

"[A] municipality can be found liable under § 1983 only where the municipality itself

causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)

(citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)).  To prevail on a

*Monell* claim, a plaintiff must demonstrate that "the alleged constitutional transgression

implements or executes a policy, regulation or decision officially adopted by the governing body

or informally adopted by custom."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)

(citing *Monell*).  For the custom or policy to qualify as the "moving force" behind the violation, there must "at the very least be an affirmative link between the municipality's policy and the particular constitutional violation alleged."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 824 n.8 (1985).

Aside from conclusory allegations, Burnett has pled no facts capable of supporting an inference that either municipality implemented a policy of intentionally denying police protection to African-American men (or persons perceived to be African-American).  Count III will therefore be dismissed.

### D.  Count IV:  42 U.S.C. §§ 1986, 1985(3), 1983 (Failure to Intervene – Berger, Hummell, Kadelski)

Count IV seeks relief pursuant to 42 U.S.C. § 1986 for the alleged failure by Defendants Berger, Hummell and Kadelski to prevent violations of equal protection.  "Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985," and Burnett has failed to state a § 1985 claim, Burnett's § 1986 claim "necessarily must fail also."  *Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980); *see also Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).

### E.  Count V: Intentional Infliction of Emotional Distress

Count V, finally, seeks relief for intentional infliction of emotional distress pursuant to Pennsylvania tort law.  The Pennsylvania Supreme Court "has yet to formally recognize a cause of action for intentional infliction of emotional distress," but the Third Circuit and Pennsylvania Superior Court have articulated the elements of the claim on the presumption that it would. *Reedy v. Evanson*, 615 F.3d 197, 231-32 (3d Cir. 2010) (citing *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000), and *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)).  To prevail, a plaintiff must "demonstrate intentional outrageous or extreme conduct by

18

the defendant, which causes severe emotional distress to the plaintiff" as well as "some type of resulting physical harm." *Id.* (citing *Swisher*, 868 A.2d at 1230). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting and citing *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1184 (Pa. Super. Ct. 1989)).

None of the actual facts pled in Burnett's Complaint, independently or together, suggest that any defendant intentionally engaged in outrageous conduct that caused Burnett emotional distress. Nor has Burnett even alleged resulting physical harm. Because the facts pled do not make out the elements of a claim for intentional infliction of emotional distress, Count V will be dismissed.

## V.   CONCLUSION

Burnett has not pled facts sufficient to state any of the claims that he asserts. The defendants' motions to dismiss will therefore be granted, and Burnett's Complaint will be dismissed in its entirety.[7] Because a court should not dismiss a complaint for failure to state a claim without granting leave to amend unless amendment would be "inequitable or futile," *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 106 (3d Cir. 2002), and it is not clear that amendment would be futile here, the Complaint will be dismissed without prejudice.

An implementing order follows.

---

[7] It is therefore unnecessary to reach the defendants' arguments regarding qualified immunity. Given that Burnett alleges intentional race and gender discrimination, however, and that the prohibition on intentional race and gender discrimination is clearly established, qualified immunity is unlikely to apply. The question is, rather, whether his claims are plausible. *See generally Iqbal*, 556 U.S. at 677-87 (assuming that qualified immunity would not bar a well-pleaded claim of intentional discrimination); *Elliot-Park*, 592 F.3d at 1008-09 ("The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it.").